# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2020 MAR -3 P 12: 52

CLERK'S OFFICE
AT GREENBELT

JOHN W. FALKENSTEIN,

    Plaintiff,

    v.

                             Civil Action No.: PJM-18-3715

SAM RAHMAN,
TIFFANY BENNETT, RN,
BRENDA REESE, RN,
DR. ALI YAHYA,
DR. AVA JOUBERT
   *Formerly known as Dr. Ava Joubert-Curtis*,
PEGGY MAHLER, NP,
WEXFORD HEALTH SOURCES, INC.,[1]

    Defendants.

---

## MEMORANDUM OPINION

Defendants Wexford Health Sources, Inc., Sam Rahman, Tiffany Bennett, R.N., Peggy Mahler, N.P., Brenda Reese, R.N., Ali Yahya, M.D., and Ava Joubert, M.D. filed a Motion to Dismiss or for Summary Judgment. ECF No. 75.[2] In response to the dispositive motion, Plaintiff filed Motions for Leave to Supplement Complaint and for Preliminary Injunction (ECF No. 78); for Preliminary Injunction (ECF No. 80); for Leave to File Pleadings in Excess of 35 pages (ECF No. 95); for Court Order (ECF No. 97; ECF No. 98);[3] for Relief from Clerical Mistake (ECF No.

---

[1] The Clerk shall correct the docket to reflect the full and correct spelling of Defendants' names and titles as reflected in the caption of this Memorandum Opinion.

[2] As of January 1, 2019, Wexford Health Sources Inc. was no longer the contracted medical care provider for the Maryland Department of Public Safety and Correctional Services (DPSCS); rather the contractual provider is now Corizon. Defendants Sam Rahman, Brenda Reese, R.N., and Ava Joubert, M.D., filed a motion to join, adopt, and incorporate the Motion for Summary Judgment filed on behalf of Wexford and its employees. ECF No. 76. That motion shall be granted.

[3] Plaintiff was provided with a docket sheet by the Clerk on November 13, 2019 and February 14, 2020; therefore, the relief sought in the Motion for Court Order has been provided. The motions shall be denied as moot.

109); and for Judgment on the Pleadings (ECF No. 110)[4] in addition to his Response in Opposition (ECF No. 89). Defendants filed a Reply in response to Plaintiff's Opposition. ECF No. 91. Thereafter, Plaintiff filed another Opposition Response (ECF No. 100), which Defendants move to strike as an unauthorized Surreply. ECF No. 107. No hearing is necessary to determine the matters now pending. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow Defendants' motion, construed as a Motion for Summary Judgment, shall be granted and Plaintiff's Motions for Preliminary Injunction shall be denied.

## BACKGROUND

A.    Complaint Allegations

Plaintiff states that on March 11, 2010, he underwent a total joint replacement of the left shoulder at GBMC Hospital prior to his incarceration which began on November 14, 2012. ECF No. 1 at 2.

In April, 2013 Plaintiff began seeking treatment from prison medical care providers for an infection in the implant, evidenced by a "two-inch nodule of infection [that] had protruded out" of his left shoulder. Plaintiff states he had to wait for months to begin a course of antibiotics and the infection persisted. ECF No. 1 at 2.

On April 8, 2014, it was determined that Plaintiff needed an "I&C (incision and clean)"[5] to address the infection. ECF No. 1 at 2-3. Plaintiff underwent the surgical procedure on July 24, 2014 at Bon Secours Hospital. *Id.* at 3. Dr. Krishnaswamy performed the procedure. *Id.* At that

---

[4]    To the extent that the Motion for Judgment on the Pleadings seeks dispositive review of the pending matters, the motion shall be granted.

[5]    This procedure is later referred to as an incision and drainage or I&D or "Irrigation and Debridement" and shall be referenced as such herein. *See* ECF No. 4 (Motion for Preliminary Injunction) and ECF No. 75-3 at 2 (Memorandum in Support of Motion for Summary Judgment).

time, Plaintiff was confined to Western Correctional Institution ("WCI") in Cumberland, Maryland.

By May of 2015, Plaintiff's left shoulder was again infected; Plaintiff faults the delay in treatment of the initial infection as the cause for the "infection to become deep-seated." ECF No. 1 at 3. According to Plaintiff, he was "in need of 'revision surgery'" which involves having the prosthetic joint removed; the wound deep cleaned and examined; and the infection treated with intravenous ("IV") antibiotics. *Id.* Plaintiff states that Dr. Krishnaswamy had determined that the prosthetic joint was partially dislocated before he performed the I&D surgery. *Id.*

Plaintiff states his shoulder remained infected from May to December 2015. ECF No. 1 at 3. On December 16, 2015, Plaintiff received a second I&D at Bon Secours Hospital. Following the surgery, Plaintiff was placed on an IV administration of Vancomycin; he was restricted to the infirmary; and he was prescribed additional oral antibiotics after six weeks of IV antibiotic treatment. Plaintiff states that the infection had "progressed to MRSA" (Methicillin-resistant Staphylococcus Aureus) but that Wexford medical providers deny the infection was MRSA. Plaintiff claims that Dr. Gedion Atnafu, the infectious disease specialist at Bon Secours, concurs with Plaintiff that the infection in his shoulder was MRSA. *Id.* Although Plaintiff was prescribed six-weeks of aftercare therapy, he states it was terminated after four weeks by Dr. Espina[6] because he became angry with Plaintiff when they disagreed over whether Plaintiff had a MRSA infection. In retaliation, Dr. Espina discontinued not only the antibiotics, but also the pain medication and "disregarded medication orders." *Id.*

On January 20, 2016, Plaintiff was sent back to Bon Secours for an "examination of the incision." ECF No. 1 at 3. Plaintiff explains that at the time he was sent to Bon Secours he had

---

[6]       Dr. Espina is not a named Defendant in this case.

"discovered a large cyst(s) in [his] scrotum, from the 'run-down' of the infection that was dripping down inside of [him] for all of this time." *Id.* Plaintiff describes these cysts as "huge and very painful."[7] *Id.* In addition to the cyst in his scrotum, Plaintiff states his "achilles tendons had become painful and [he] was unable to jog anymore for one year." *Id.*

According to Plaintiff "[e]very orthopeadic surgeon that had examined [him] said that [he] needed a revision surgery." *Id.* The surgeons who told Plaintiff he needed the surgery included Dr. Manning, Dr. Krishnaswamy, Dr. Yahya, Dr. Ottey, Dr. Carls, and Dr. Ryan.[8] *Id.* Plaintiff adds that he has suffered for years and has continuously been denied pain medication, antibiotics, and proper treatment. *Id.*

Plaintiff is currently incarcerated at North Branch Correctional Institution ("NBCI") where he claims "inmates are locked in their cell twenty-two hours per day, as a sanction for seeking proper medical assistance." ECF No. 1 at 4. Plaintiff states that he has "lived with a dislocated left arm" since 2012 because the shoulder prosthesis "is extended and unseated out of [his] humerous bone." *Id.* He adds that he has two torn tendons which reduces his range of motion to 18% and causes constant pain. *Id.*

According to Plaintiff the infection in his shoulder caused "a snot-like infection" to leak "out of a weep-hole in [his] shoulder" and allowed MRSA to drip down inside of his body, causing cysts throughout his body. ECF No. 1 at 4. He states that multiple CT Scans have revealed cysts in his lungs, liver, kidneys and scrotum. *Id.* He has lost 30 pounds and developed high blood pressure due to the chronic pain. *Id.* Despite the infection he had, Plaintiff states he went from September 21, 2016 to June 28, 2017 without antibiotics to treat it. *Id.* On June 28, 2017, he was

---

[7]     Plaintiff states the cysts in his scrotum were surgically removed on October 23, 2018, by Dr. M. Allaway. ECF No. 1 at 3.

[8]     Only Dr. Yahya is a named Defendant.

prescribed Doxacycline for ten days, but according to Plaintiff is was "insignificant" and he received no further prescriptions. *Id.*

On November 21, 2017, Plaintiff went back to Bon Secours for a third I&D, after which he was given six weeks of IV Vancomycin, twice daily, while he was isolated in the infirmary. ECF No. 1 at 4. Following that treatment, Plaintiff received two weeks of Ciprofloxacin and six months of Doxacycline twice per day. *Id.* At the time Plaintiff filed this complaint, his shoulder remained "dark red and swollen," but the infection is now "at bay." *Id.*

As relief Plaintiff seeks revision surgery for his shoulder joint replacement; antibiotics and pain medications; transfer to Jessup Correctional Institution (JCI); and compensatory damages. ECF No. 1 at 6.

Shortly after filing this complaint, Plaintiff filed a Motion for Preliminary Injunction seeking an Order requiring revision surgery to his shoulder which he alleged all medical providers acknowledged as necessary. ECF No. 4. This Court directed counsel for DPSCS to show cause why the relief sought should not be granted. ECF No. 5. The response, which included declarations and verified medical records, indicated that the recommended surgery to Plaintiff's left shoulder was authorized and was to be scheduled within 30 days. ECF No. 9. A status report filed March 13, 2019, indicated that while Plaintiff's shoulder surgery was approved and he was evaluated by two different orthopedic surgeons on February 8 and 15, 2019, it had not yet been scheduled. ECF No. 40-1. According to the declaration filed by Sharon Baucom, M.D., Director of Clinical Services for DPSCS, three physicians "who had previously been in consultation with Plaintiff will not agree to perform the surgery because either the surgery is beyond the scope of their surgical practice or because Plaintiff is not permitted to return to their office." *Id.* at 1, ¶3. At the time of the status report, "[a]nother physician at Johns Hopkins Hospital ha[d] agreed to

conduct an evaluation of Plaintiff's shoulder" and "[i]f that physician agrees to perform the shoulder surgery, a surgery date will then be scheduled." *Id.*

On May 16, 2019, this Court directed counsel for DPSCS to provide additional information regarding Plaintiff's ongoing medical care. ECF No. 49. The response indicated that Plaintiff underwent revision of the total shoulder arthroplasty with irrigation and debridement (I&D) of the joint and bone on April 8, 2019, at Johns Hopkins Hospital. ECF No. 50 at 3-11 (medical records), *see also* ECF No. 51. In light of the fact that Plaintiff received the surgery to his shoulder, his first Motion for Preliminary Injunction was denied. ECF Nos. 54 and 55.

B.    <u>Defendants' Motion for Summary Judgment</u>

In support of their motion, Defendants submit the affidavit of Dr. Asresahegn Getachew, the Medical Director for NBCI and WCI. ECF No. 75-6 at 1, ¶1. Dr. Getachew explains that Plaintiff's medical history includes a bilateral total shoulder arthroplasty, left shoulder recurrent idiopathic cystic masses, Hepatitis C virus, abnormal "radiologic opacities" in the lungs, right scrotal hydrocelectomy, and bilateral epidymal cysts. *Id.* at ¶3.

Dr. Getachew states that Plaintiff "has a poor understanding of his medical condition" citing Plaintiff's allegation that "he has acquired scrotal cysts due to infection running down from his left shoulder to his scrotum." ECF No. 75-6 at 4, ¶13. The right hydrocele and small epidymal cysts are not caused by an infection and neither is related to the condition of Plaintiff's shoulder. *Id.* Dr. Getachew explains that a "hydrocele is a fluid sac within the scrotum" which can be painful and can occur at any age. *Id.* Plaintiff's hydrocele was successfully removed in October 2018. *Id.*

Further, Dr. Getachew states that Plaintiff's claim he has "acquired cysts in his lungs, liver, and kidneys due to his shoulder condition" is also incorrect. *Id.* at 5, ¶14. Plaintiff's chest x-ray

revealed "two areas of opacity" which were confirmed by CT scan to be "prior granulomatous disease."[9] *Id.* The CT scan also shows "mild changes of COPD or emphysema with bibasilar scarring, a 2x1mm non-obstructing left renal calculus, and two liver hypodensities likely representing cysts." *Id.* Dr. Getachew explains these conditions are "independently occurring and [are] not unusual to see . . . in persons over sixty years of age."[10] *Id.* Dr. Getachew also states that Plaintiff's lab work between November 2015 and December 31, 2018, never reflected he had MRSA and even if it had, there is "no evidence Plaintiff formed any cysts secondary to any MRSA infection." *Id.* at ¶15.

Dr. Getachew also addresses Plaintiff's claims that he did not receive appropriate medication. During the period between November 2015 and December 31, 2018, Plaintiff has been "continuously" prescribed the following medications for pain management: Neurontin,[11] Naproxen, Tramadol,[12] Ibuprofen, Percocet,[13] Tylenol #3, Amitriptyline,[14] and Genaced.[15] ECF No. 75-6 at 5, ¶16. In December of 2018, there was an intention to replace Tramadol with

---

[9] Granulomatous disease is "an inherited disorder that occurs when a type of white blood cell that usually helps your body fight infections doesn't work properly. As a result, the phagocytes can't protect your body from bacterial and fungal infections. People with chronic granulomatous disease may develop infections in their lungs, skin, lymph nodes, liver, stomach and intestines, or other areas." https://www.mayoclinic.org/diseases-conditions/chronic-granulomatous-disease/symptoms-causes/syc-20355817 (last visited Feb. 27, 2020).

[10] Plaintiff is 63 years old. ECF No. 75-6 at 1, ¶3.

[11] Neurontin or gabapentin is used to treat seizures and painful nerve diseases. *See* https://www.drugs.com/cdi/neurontin-gabapentin-capsules.html (last visited Feb. 24, 2020).

[12] Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain. *See* https://www.drugs.com/tramadol.html (last visited Feb. 24, 2020).

[13] Percocet is a combination of acetaminophen and oxycodone. *See* https://www.drugs.com/search.php?searchterm=Percocet (last visited Feb. 24, 2020).

[14] Amitriptyline is a tricyclic antidepressant. *See* https://www.drugs.com/amitriptyline.html (last visited Feb. 24, 2020).

[15] Genaced is acetaminophen, aspirin, and caffeine. *See* https://www.drugs.com/drug-interactions/acetaminophen-aspirin-caffeine,genace.html (last visited Feb. 24, 2020).

Cymbalta[16] and Mobic, but the orders were never placed; at that time, Plaintiff was receiving Ibuprofen for his pain. *Id.* Dr. Getachew notes that Plaintiff's long term pain medication prescriptions which include Neurontin and Tramadol are not ordinarily dispensed and are evidence that his complaints are taken seriously. *Id.* at 7, ¶19.

Additionally, Plaintiff received numerous prescriptions for antibiotics to address the infections he experienced. *Id.* at 6, ¶17. Dr. Getachew states that "antibiotics are not to be continuously prescribed and typically should only be prescribed when symptoms of infection are clinically presented." *Id.* Plaintiff's "left shoulder condition chronically presented with potential symptoms of infection and antibiotic prescriptions were at times made empirically." *Id.* Dr. Getachew states that Plaintiff's allegation that he did not receive antibiotics for an infection from May to December of 2015 is incorrect: he did not have an infection at that time. *Id.* Specifically, "[w]ound cultures on April 10, 2015 and September 18, 2015 were both negative for bacterial growth." *Id.* Lastly, "Plaintiff has had an active prescription for either HCTZ or Lisinopril, or both, since October 2017" to address his hypertension. *Id.* at ¶18.

Dr. Getachew also denies that Plaintiff has had "a weep hole that remained an open wound" for years. ECF No. 75-6 at 6, ¶19. He explains that Plaintiff's "left shoulder cyst has occasionally drained fluid, typically after an I&D or debridement surgery" and when that occurred, he was "treated and the wound healed within weeks or months." *Id.*

"Plaintiff's shoulder condition was deemed to warrant outside I&D surgery at [Bon Secours Hospital] by Dr. Krishnaswamy in December 2015." *Id.* Following the surgery, Plaintiff was placed in the infirmary for a four week course of IV antibiotics. *Id.* The left shoulder cyst

---

[16]     Cymbalta (duloxetine) is a selective serotonin and norepinephrine reuptake inhibitor antidepressant (SSNRI). It is used to treat: anxiety, back pain, chronic pain, depression, diabetic peripheral neuropathy, fibromyalgia, generalized anxiety disorder, major depressive disorder, and osteoarthritis. *See* https://www.drugs.com/international /cymbalta.html (last visited Feb. 24, 2020).

returned by May of 2016, measuring 3cm x 3cm, "but the surgeon Dr. Saleem did not recommend surgery unless it abscessed or got much bigger." *Id.* The cyst on Plaintiff's shoulder had grown by June of 2017 and the following month Plaintiff was evaluated by Dr. Carls and Dr. Krishnaswamy. *Id.* at ¶20. Both doctors recommended that Plaintiff should be evaluated by a shoulder specialist, but in November 2017, Dr. Krishnaswamy recommended another I&D with debridement. *Id.* The procedure was performed and Plaintiff was confined to the infirmary where he again received a six week course of IV antibiotics. *Id.* Plaintiff was discharged from the infirmary in January 2018. *Id.*

Plaintiff again complained about left shoulder pain in November 2018 and he was referred to Dr. Carls, who saw Plaintiff in February 2019. ECF No. 75-6 at 7, ¶22. Dr. Carls determined that Plaintiff's "total shoulder arthroplasty (TSA) had failed" and revision surgery would be required by a shoulder specialist. *Id.* Bon Secours Hospital did not have a shoulder specialist and the University of Maryland Medical Systems (UMMS) was not taking any additional patients at that time. *Id.* Two months after Dr. Carls' evaluation, Plaintiff underwent "explant surgery and an antibiotic spacer was inserted" at Johns Hopkins Hospital. *Id.* at 7-8, ¶22. The procedure was followed by six weeks of IV antibiotics at the prison infirmary. *Id.* at 8, ¶22. Currently, Plaintiff's condition is being monitored for any signs of infection and "possible repeat TSA surgery." *Id.*

With respect to the individual Defendants named by Plaintiff, Dr. Getachew provides the following overview of each party's participation in Plaintiff's course of care. As a medical administrator for the Cumberland region, Defendant Sam Rahman "has never provided medical care to Plaintiff" as he is "not a nurse, mid-level provider or physician providing medical care to inmates." ECF No. 75-6 at 2, ¶5. Additionally, Defendant Tiffany Bennett, R.N., who was a nurse at WCI until September 2016, never provided nursing care to Plaintiff during the period between

November 2015 to December 31, 2018. *Id.* at ¶6. Dr. Getachew also states that Plaintiff's allegation that Dr. Ava Joubert denied him antibiotics from September 21, 2016 through June 28, 2017, is incorrect as Dr. Joubert did not have any encounters with Plaintiff during that period of time, nor did she ever deny antibiotics for Plaintiff at any other time. *Id.* at ¶7.

Defendant Brenda Reese is a registered nurse and as such "does not diagnose patients, develop treatment plans, or prescribe medications." ECF No. 75-6 at 2, ¶8. Reese encountered Plaintiff on five occasions between the period of November 2015 through December 31, 2018, when Plaintiff was in the WCI infirmary receiving IV antibiotics. *Id.*

Dr. Ali Yahya is named as a Defendant because, according to Plaintiff, Dr. Yahya admitted he needed shoulder revision surgery. ECF No. 75-6 at 3, ¶9. Dr. Yahya saw Plaintiff in April 2017 to "aspirate Plaintiff's left shoulder cyst" but "[n]o fluid could be obtained" and Dr. Yahya requested a consultation for Plaintiff's cyst to be evaluated by an orthopedic surgeon. *Id.* Dr. Yahya also saw Plaintiff in December 2017 when Plaintiff was confined to the WCI infirmary for IV antibiotics. *Id.* During the times Dr. Yahya saw Plaintiff, no changes were made to Plaintiff's treatment plan because Plaintiff was responding appropriately to the treatment being provided. *Id.* Dr. Getachew states that there is "no medical record of any encounter . . . with Plaintiff in which Dr. Yahya recommended Plaintiff have shoulder revision surgery." *Id.*

Defendant Peggy Mahler is a Nurse Practitioner ("NP") and is one of Plaintiff's mid-level providers. ECF No. 75-6 at ¶10. Mahler saw Plaintiff on nine occasions for medical care: September 7, 2016; October 10, 2016; December 27, 2016, March 1, 2017, June 1, 2017, August 28, 2017, December 16, 2017, January 8, 2018, January 29, 2018, and February 12, 2018. *Id.* Although Plaintiff claims that Mahler denied him medical care without specifying what care was

denied, neither Dr. Getachew or Mahler were able to discern when during these encounters that medical care was denied. *Id.*

With regard to Plaintiff's claim that he was transferred from WCI to NBCI in retaliation for seeking medical care, Dr. Getachew notes that transfers from one prison to another are not decisions entrusted to medical providers. ECF No. 75-6 at 4, ¶11. Only in rare instances where, for example, an inmate becomes wheelchair bound will medical staff recommend a transfer to a suitable facility to accommodate the disability. *Id.* In Plaintiff's case, Dr. Getachew suggests that he "was simply transferred by correctional officials in the normal course of their operation of the prison system." *Id.*

Dr. Getachew also explains that Plaintiff had an episode of unexplained weight loss in December 2018, when his weight dropped to 140 pounds. ECF No. 75-6 at 4, ¶12. Plaintiff's height is 5'6" and his normal weight is between 150 and 165 pounds. *Id.* At the time of his weight loss Plaintiff denied any loss of appetite and reported that he ate well. *Id.* In April of 2019, Plaintiff's weight returned to 155 pounds. *Id.*

C.    Supplemental Complaint and Preliminary Injunction

Following Defendants' Motion to Dismiss or for Summary Judgment, Plaintiff filed a Motion for Leave to Supplement Complaint and Preliminary Injunction. ECF No. 78. By his motion, Plaintiff seeks to add as Defendants Katrina Opel and Holly Pierce and states they should be substituted for the John Doe Defendants named in the original complaint. *Id.* at 2. He alleges that Opel and Pierce are "personally responsible for over-seeing the functioning of the medical department" at NBCI; that he has been denied proper medical treatment; and his "medication was unprofessionally and abruptly discontinued." *Id.* at 3-4, ¶¶5-8. Plaintiff states he has been receiving Ultram since 2013 for treatment of the pain associated with his dislocated left shoulder.

*Id.* at 4, ¶8. He states that Ultram is "an addictive synthetic narcotic" which should be "tapered off" when it is stopped, but with the current state of his dislocated shoulder, stopping the pain medication should not be considered. *Id.* He adds that he is "being denied access to seeing the medical doctor" and asks for unspecified injunctive relief. *Id.* at 5, ¶9. Defendants oppose Plaintiff's Motion for Leave to Supplement (ECF No. 79) and argue that the proposed amendment would be both prejudicial and futile. The Motion to Supplement the Complaint shall be denied as the allegations against Opel and Pierce do not state a claim, rendering the amendment futile.

Plaintiff's Motion for Preliminary Injunction (ECF No. 80), filed August 12, 2019, alleges that following the surgery performed at Johns Hopkins Hospital on April 8, 2019, the plan was for Plaintiff to return to Johns Hopkins, after three months without antibiotics, for blood work to determine if the infection was clear. *Id.* at 4. Plaintiff states the appointment was supposed to be made in May 2019 so that he would be assured a "spot for admittance in proper time." *Id.* In the event the infection remained, Plaintiff was to receive six weeks of antibiotics through a "PICC line." *Id.* If the infection was gone, "the hardware could be implanted back into the left shoulder." *Id.* at 4-5. In its current state, Plaintiff's left shoulder is "100% dislocated" and "extremely painful." *Id.* at 5. Plaintiff explains that the surgery is "only one-half complete." *Id.*

Plaintiff claims that this Court's intervention is necessary because the history of his care indicates that medical providers will not follow through on the stated plan of care. ECF No. 80 at 5. In addition, he states that is "experiencing extreme sanction for filing a complaint and injunction" and claims all of his medications for pain and hypertension have been "completely discontinued since June 30, 2019." *Id.* The increased pain is interfering with Plaintiff's sleep and he claims he is unable to sleep more than 20 minutes at a time for four to five days, then he may sleep for two hours "from sheer exhaustion." *Id.* at 6. At an unspecified time, Plaintiff states he

was "allowed to speak with . . . Dr. Getachew" who refilled his prescriptions, but the refills were "lost and not administered." *Id.* at 7. Plaintiff requests that this Court issue an order immediately restoring his medication; requiring follow through with the treatment plan designed by Johns Hopkins; and ensuring a follow-up appointment with Dr. Moon at Johns Hopkins is made. *Id.* at 8.

This Court issued an Order to Show Cause why Plaintiff's request for injunctive relief should not be granted and directed counsel for Defendants as well as counsel for the Division of Correction to respond. ECF No. 81. The responses (ECF Nos. 84 & 85) indicate that Plaintiff's claims are unsupported by objective evidence that would entitle him to the relief sought.

Despite Plaintiff's assertions otherwise, he has had three post-surgical follow-up visits with Johns Hopkins physicians. ECF No. 84-1 at 2 (Aug. 22, 2019 follow-up); 14 (May 20, 2019 follow-up); 42 (April 22, 2019 follow up). Plaintiff's shoulder pain was addressed by Holly Pierce, CRNP on July 17, 2019, when he reported mild to moderate pain, but was not in acute distress. ECF No. 85-1 at 3, ¶ 8. Pierce examined his shoulder and found it was tender with a moderately reduced range of motion, but states that the shoulder is not dislocated as claimed by Plaintiff. *Id.*, *see also* ECF No. 85-2 at 8. Plaintiff was instructed to continue taking Tylenol and Ibuprofen as prescribed. ECF No. 85-2 at 10. That day, Plaintiff was subjected to a random urine test which came back as positive for suboxone, or buprenorphine and norbuprenorphine.[17] ECF No. 85-1 at 4, ¶ 9. Pierce explains that this substance is "a highly addictive and powerful narcotic not prescribed in the prison setting." *Id.* The only source of its availability is through illegal smuggling of the drug into the prison. *Id.*

---

[17] Plaintiff pled guilty to violating Inmate Rule 112, prohibiting the use of a controlled substance or use of medication without a prescription. ECF No. 84-3 at 1-9. He was sentenced to 60 days of disciplinary segregation. *Id.* at 5. Plaintiff asserts that when he was no longer receiving pain medication from medical staff, he "started buying his own through the black market." ECF No. 96 at 12.

Further, a July 26, 2019 x-ray of Plaintiff's left shoulder showed a "deformity of gleno-humeral joint likely related to prior injury and surgery," but no evidence of dislocation. ECF No. 85-1 at 4, ¶ 11; ECF No. 85-2 at 18.

During his August 22, 2019 follow up appointment, Plaintiff was seen by Dr. Uma Srikumaran at Johns Hopkins Orthopedics. ECF No. 85-2 at 27-30. Based on his examination, Dr. Srikumaran "concluded the patient was 'progressing appropriately' after surgery and recommended continuing range of motion and stretching exercises." ECF No. 85-1 at 5-6, ¶ 16. A revision arthroplasty was not recommended "due to high risk of infection and lack of glenoid bone stock;" rather, "Dr. Srikumaran believed the patient's best option is to maintain the articulating antibiotic spacer." *Id.*

On August 25, 2019, Pierce discussed with Plaintiff his description of his shoulder being dislocated and he told Pierce "the left shoulder was 'hanging' out of the socket" while also reporting he was able to "don and doff clothing including shoes and socks, eat, and shower without assistance." ECF No. 85-1 at 6, ¶ 17. Further, Pierce states he did not appear to be in distress. *Id.*

In May 2019, Plaintiff was provided the following medication for pain: acetaminophen to keep on person to June 27, 2019; ibuprofen as needed to May 27, 2019; aspirin to September 7, 2019; and Tramadol to July 1, 2019. ECF No. 85-1 at 2-3, ¶6 (Decl. of Holly Pierce); ECF No. 85-2 at 1 (Medical Records). In June 2019, he was prescribed amitriptyline (Elavil) and Tramadol for pain until July 1, 2019. ECF No. 85-1 at 2-3, ¶ 6; ECF No. 85-2 at 2. Pierce discussed pain management with Plaintiff on August 25, 2019 and reports that Plaintiff was unhappy with the fact that his Ultram/Tramadol prescription had stopped as of July 1, 2019 and argued that it was an SSRI which required tapering. ECF No. 85-1 at 7, ¶ 19. Pierce explained that Ultram is an opiate with a high risk for addiction and dependence especially for Plaintiff given his history of

medication abuse and recent positive test for suboxone.[18] *Id.* Plaintiff disagree with Pierce; stated that Ultram "acts in a similar manner as an SSRI;" that withdrawal can harm the neurological system; and that amitriptyline, which he was being prescribed, causes altered mental capacity, memory fog, and fatigue. *Id.* Based on his concerns regarding amitriptyline, Plaintiff asked for it to be discontinued. *Id.* Pierce attempted to discuss treatment options with Plaintiff, but he became so verbally aggressive, the visit was stopped for safety concerns. *Id.* Nevertheless, Pierce ordered ibuprofen for Plaintiff's pain. *Id.* Pierce adds that Plaintiff exhibited no signs of withdrawal during the visit, negating any need to renew a prescription for Ultram. *Id.*

Pierce also saw Plaintiff on July 17, 2019, for a chronic care visit, during which Plaintiff reported a history of hypertension, but at that time his blood pressure was normal at 122/80. ECF No. 85-1 at 3, ¶ 7; ECF No. 85-2 at 8. He also told Pierce that the last time he took any blood pressure medication was over one month ago. *Id.* In light of the fact that Plaintiff's blood pressure was normal, he was not taking blood pressure medication, and he reported no signs of hypertension, Pierce determined he no longer needed blood pressure medication and ordered twice weekly blood pressure checks for the following two weeks to monitor any changes. ECF No. 85-1 at 3, ¶ 7; ECF No. 85-2 at 9-10. Plaintiff's blood pressure was measured on July 25 (ECF No. 85-2 at 17); July 31 (*id.* at 19); August 2 (*id.* at 20); August 4,(*id.* at 21); and August 13, 2019 (*id.* at 24). On August 13, 2019, Pierce updated Plaintiff's chart and noted his recent positive test for suboxone. ECF No. 85-1 at 5, ¶ 15. She states that Plaintiff was controlling his hypertension with diet and exercise, but because "suboxone withdrawal could result in fast or erratic heartbeat and/or

---

[18]     Plaintiff also has a history of PCP and Heroin use. ECF No. 9-2 at 26. Plaintiff admits to PCP use from May to November 2012, but claims the history concerning narcotics presented in the responses to show cause are incorrect. ECF No. 96 at 5-6.

high blood pressure" Plaintiff's "hypertensive medications, lisinopril and hydrochlorothiazide" were renewed. *Id.*

On August 4, 2019, Plaintiff saw Michael Klepitch, RN for his complaints of a testicular cyst. ECF No. 85-2 at 22. Plaintiff reported he had a cyst on his left testicle that had grown in size and texture and was causing discomfort. Klepitch referred Plaintiff to a provider for evaluation of the issue *Id.* When Plaintiff was seen by Pierce on August 25, 2019, he reported that the infection in his left shoulder was draining into the left testicle, causing swelling and "septation." ECF 85-1 at 6, ¶ 18, *see also* ECF No. 96-1 at 4 (Plaintiff's Sick Call Slip). Plaintiff told Pierce that "he had the right testicle removed and he was convinced the same matter was happening to the left side." ECF 85-1 at 6, ¶ 18. He described "a hazelnut-sized cyst that was increasing in size as the infection continued to drain from the shoulder." *Id.* Pierce explains that Plaintiff has a history of a "right hydrocele, spermatocele, and epididymal cyst." *Id.* At the time of his examination, Plaintiff did not have fever, chills, night sweats, or associated symptoms. *Id.* Following this visit, Pierce wrote a consultation request for Plaintiff to have a scrotum/testicular ultrasound, a CT scan of the chest without contrast, and an x-ray of his left shoulder. *Id., see also* ECF No. 85-2 at 34-38.

D.    Plaintiff's Opposition Response and Related Motions[19]

Plaintiff filed a Response in Opposition addressing Defendants' Motion to Dismiss or for Summary Judgment, entitled "Declaration in Opposition to Defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment." ECF No. 89. An earlier filed pleading docketed as Plaintiff's Opposition Response (ECF No. 86) should have been docketed as correspondence notifying the Court that Plaintiff did not receive a full copy of the exhibits submitted with

---

[19]    Defendants' Reply is addressed in the analysis section below.

Defendants' motion. To the extent that Plaintiff seeks correction of the docket (ECF No. 109), it shall be granted with respect to ECF No. 86 but otherwise denied.

Plaintiff also filed a "Request for Subpoena Duces Tecum" (ECF No. 87), seeking the issuance of a subpoena for records from Dr. Gedion Atnafu of Bon Secours Hospital and Dr. Allaway, who is the urologist that performed the surgery on Plaintiff's right testicle. ECF No. 87-1 at 1-2. Plaintiff relies on Fed. R. Civ. P. 34 and 41 in support of his request; however, neither rule is applicable here as discovery has not commenced in this case (Rule 34), nor has a trial date been set (Rule 41). To the extent the pleading may be construed as one filed pursuant to Fed. R. Civ. P. 56(d), the documents Plaintiff seeks do not concern issues of material fact in connection with his Eighth Amendment claim against these Defendants. Specifically, Plaintiff seeks all lab reports following his hospitalization on December 16, 2015 and November 21, 2017; and all pre- and post-operative reports related to removal of the hydrocele cyst on October 23, 2018. ECF No. 87-1. As more fully explained below, there is no genuine dispute of material fact regarding the existence of an infection in Plaintiff's shoulder or that removal of the hydrocele cyst was required. The request is accordingly denied and Plaintiff's Motions for Court Order (ECF Nos. 97, 98), are also denied to the extent the motions seek a subpoena and are denied as moot to the extent they seek a copy of the docket report.

After Plaintiff filed his Response in Opposition and Defendants filed a Reply (ECF No. 91), Plaintiff, in apparent reliance on his pending request for subpoena, filed a Motion for Leave to File Responsive Pleading in excess of 35 pages. ECF No. 95. Plaintiff then filed a second Opposition Response (ECF No. 100) which he entitles "Brief in Response to Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgement." Defendants move to strike this pleading as an unauthorized surreply. ECF No. 107. This pleading was incorrectly docketed

as responding to ECF No. 76, which is a Motion for Joinder. Defendants cite Local Rule 105.2 prohibiting surreplies absent an Order from this Court and seek to file a reply to Plaintiff's Surreply in the event this Court declines to grant the Motion to Strike. ECF No. 107 at 2. Defendants also note that Plaintiff's Surreply is 130 pages long with 45 pages of exhibits and state that the pleading is repetitive. *Id.* at 1. This Court has reviewed Plaintiff's Surreply and finds that the matters asserted therein are in fact repetitive of arguments raised elsewhere and does not include evidence or exhibits unavailable for the Court's review in other pleadings. Under Fed. R. Civ. P. 12(f) this Court "may strike from a pleading . . . any redundant, immaterial, matter." Accordingly, the Motion to Strike shall be granted and the Motion for Leave to File shall be denied.

Plaintiff's Opposition Response (ECF No. 89) and his Reply to the Show Cause Responses (ECF No. 96) state the following narrative of his claims. Plaintiff admits that he has received extensive medical care, but asserts that the delays involved in treating the infection to his shoulder have caused him harm. ECF No. 89 at 1. He claims that the infection was an obvious serious medical need that went without proper treatment and cites the recurrence of the infection as evidence that the treatment provided was improper. Plaintiff maintains that the three surgeries he was provided for treatment of the infection were improper as what was actually needed was a replacement of the entire implant in his shoulder, but temporary "fixes" were chosen instead. ECF No. 96 at 2. The chosen course of treatment, in Plaintiff's view, is the result of a policy that is unconstitutional as it results in improper medical care that caused his suffering. ECF No. 89 at 12. Additionally, Plaintiff states that he has been retaliated against for the filing of this lawsuit as evidenced by the withdrawal of medications to treat both his hypertension and the pain associated with his shoulder condition. ECF No. 89 at 10, 13. According to Plaintiff, the withdrawal of pain medication, the number of times he has received a CT Scan (four), and his lack of sleep, have

compromised his immune system, causing the infection in his shoulder to flare up repeatedly as well as exposing him to a higher risk of cancer. ECF No. 96 at 4, 12. He attributes the current diagnosis that his shoulder cannot be repaired to the chronic infection and continues to claim that the infection has "dripped down" into his body, causing the issues with his testicular cysts as well as cysts on other organs in his body. *Id.* at 2, 6-7. Plaintiff states that "proper care" in his case was to remove the hardware from his shoulder so the infection could be cleared, but that care was delayed and only occurred because he filed this action in this Court and sought an injunction. *Id.* at 2. As evidence that removal of the hardware is the only correct treatment, Plaintiff cites an instance on February 26, 2019, when "he was rushed over to the infirmary where he received 40 antibiotic infusions over a 10 day period." *Id.* at 4, *see also id.* at 6-7 (Plaintiff opining that the revision surgery should have been performed in late 2016).

He claims he is currently experiencing another delay in treatment for the cystic growth in his left testicle which he states is large and painful. ECF No. 96 at 3. He acknowledges that the cyst has been imaged through ultrasound on two different occasions: April 6, 2016 and February 2, 2018, but states "[t]his has become urgent and the risk is steadily increasing." *Id.* The "risks" Plaintiff attributes to this condition are increasing pain, danger of "septation," testicular torsion, and testicular cancer. *Id.*

With regard to his pain medications, Plaintiff states he was given Ultram "up to 200 mg per day" for six years. ECF No. 96 at 5. He asserts he should have been weened off this medication rather than having it abruptly stopped. *Id.* Plaintiff also argues that if he were not incarcerated he would be "on Tramadol for life." *Id.* at 7. He disputes the veracity of the "schedule of pain medication" submitted with Defendants' motion and explains that the "start" date represents the date the medications are requested and not necessarily when they are received as frequently

nonformulary requests are not approved, prescriptions are not processed in a timely manner, and at times are simply lost. *Id.* at 9. Plaintiff claims that his shoulder is "100% dislocated for life" and the "antibiotic infused 'spacer'" placed in Plaintiff's shoulder during the April 8, 2019 procedure at Johns Hopkins, "is very abrasive." *Id.* at 8. He describes being able to "hear and feel the bone on bone" in his shoulder and argues this justifies providing him with a pain management program that includes medication as well as a transfer to Jessup Correctional Institution (JCI) "where he could get proper treatment." *Id.* Plaintiff does acknowledge that he is receiving 600 mg of Motrin for treatment of pain, but states that his "arm remains out of the socket." *Id.* at 11.

## STANDARDS OF REVIEW

A.    Summary Judgment Standard

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in

her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

B.     Motion to Dismiss

In reviewing the complaint in light of a Motion to Dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6) the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

The Supreme Court of the United States explained a "plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* at 555. Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations

in the complaint." *Id.* at 563. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

C.    Preliminary Injunction Standard

A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren,* 553 U.S. 674, 689–90 (2008). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994).

With respect to the injunctive relief sought as a remedy in the complaint, Plaintiff must establish that there is an ongoing violation of his constitutional rights that is likely to continue.

"[T]o survive summary judgment, he must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

D.    Eighth Amendment Standard

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer*, 511 U.S. at 834-7; *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535

F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey,* 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer v. U.S. Bureau of Prisons,* 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Iko,* 535 F.3d at 241); *see also Scinto v. Stansberry,* 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer,* 511 U.S. at 839-40. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson v. Kingsley,* 877 F.3d 539, 545 (4th Cir. 2017) (quoting *Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce,* 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.,* 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer,* 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk

24

from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

If the required subjective knowledge is established, a defendant may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable."). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)) *see also Lightsey*, 775 F.3d at 179 (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta*, 708 F.3d at 526 (transgender inmate stated plausible claim in alleging defendant's refusal to evaluate her for gender reassignment surgery where current therapy failed to alleviate urge for serious self-harm).

The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (emphasis added) (quoting *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)). "[A]n inadvertent failure to provide adequate medical care" does not amount to deliberate indifference." *Estelle*, 429 U.S. at 105-06; *accord Anderson*, 877 F.3d at 543 ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and

Unusual Punishments Clause."). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)); *accord Lightsey*, 775 F.3d at 178 ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference.").

## ANALYSIS

Defendants assert that at least some of Plaintiff's claims are barred by the statute of limitations; that the complaint allegations against Defendants Rahman, Bennet, Reese, Yahya and Mahler do not state a claim; that the undisputed facts establish that Plaintiff received constitutionally adequate medical care; that the claim against Defendant Wexford Health Sources, Inc. ("Wexford") does not state a claim; and Plaintiff is not entitled to injunctive relief. ECF No. 75.

A.    Statute of Limitations

"Section 1983 provides a federal cause of action, but in several respects relevant here, federal law looks to the law of the State in which the cause of action arose. This is so for the length of the statute of limitations: it is that which the State provides for personal-injury torts." *Wallace v. Kato*, 549 U.S. 384, 387 (2007) (citing *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)). In Maryland, the applicable statute of limitations is three years from the date of the occurrence. *See* Md. Code Ann., Cts & Jud. Proc. § 5-101.

Plaintiff raises matters in his complaint that concern events that occurred more than three years prior to the date the complaint was filed, November 30, 2018. ECF No. 1. To the extent that the facts alleged are asserted as claims and are not included as simply background information, they are barred by the statute of limitations and there is no discernible basis for tolling the

limitations period. Plaintiff's assertions, contained in his unauthorized Surreply, that the doctrine of discovery applies to his claims is without merit as there is no evidence that the injury allegedly caused by these Defendants could not have been discovered with due diligence. To the contrary, Plaintiff repeatedly asserts that the condition of his shoulder was patently obvious to even a lay person.

B.    Sufficiency of Allegations against Rahman, Bennet, Reese, Yahya and Mahler

Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Although a complaint need not contain detailed allegations, the facts alleged must be enough to raise a right to relief above the speculative level and require "more than labels and conclusions," as "'courts are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555. The complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678

With regard to Defendant Sam Rahman, Plaintiff's sole allegation against him is that he is a medical administrator. ECF No. 1 at 5. There is no evidence, nor any reasonable inference that could be drawn from the allegation, that Rahman has participated in any manner in the alleged deprivation of Plaintiff's constitutional rights by virtue of his position as an administrator. Likewise, Plaintiff's allegations against Defendants Tiffany Bennett and Brenda Reese are also seemingly based solely on their positions as supervisors and contain no specific allegations of wrong-doing by either party. *Id.*

Plaintiff includes more information in his claims against Defendants Dr. Yahya and Peggy Mahler, NP, but the exact nature of their alleged wrongful conduct is not discernible from the complaint. Plaintiff asserts that Dr. Yahya admitted Plaintiff needed revision surgery and participated in discussions regarding his condition, but he fails to explain how either of these two allegations amount to an Eighth Amendment claim. ECF No. 1 at 5. Plaintiff's claim as to Mahler is simply that she is responsible for his medical care and writes order for medications prescribed to him. *Id.* Although he implies Mahler has denied him care, Plaintiff does not state what care she has denied him, when it was denied, and, importantly, how that denial amounted to cruel and unusual punishment. The complaint fails to state a claim with respect to Defendants Rahman, Bennet, Reese, Yahya and Mahler and shall be dismissed with respect to these defendants.

C.     Sufficiency of Constitutional Claim

The record evidence presented by Defendants makes clear that Plaintiff's medical need was in fact a serious one. However, as noted, the inquiry does not end there. Equally apparent from the affidavits and medical records documenting Plaintiff's treatment is that the Defendants have provided constitutionally adequate care. Plaintiff's apparent belief that because the infection returned it was treated inadequately is unsupported by any objective evidence. His insistence that the infection was MRSA despite being told that the cultures came back negative for that particular type of infection is the very definition of "mere disagreement" with medical opinion that cannot sustain an Eighth Amendment claim. Likewise, his belief that his shoulder infection "dripped down" into other parts of his body causing other medical issues is also simply his belief and is unsupported by any objective evidence.

The undisputed facts are that Plaintiff sustained recurrent infections to his shoulder which were addressed through multiple administrations of antibiotics as well as three surgical

interventions. The delay in providing Plaintiff with the complex surgery required after the I&D procedures did not permanently address the problem was not due to wanton disregard of his suffering. Rather, after an independent evaluation of his shoulder occurred, effort was required to locate a surgeon who was qualified to do the procedure. Thus, the delay cited by Plaintiff is not evidence of an Eighth Amendment violation.

With regard to Plaintiff's claim that he was transferred to another prison in retaliation for seeking medical care is also without merit. "A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone." *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (*judgment vacated on other grounds*, 525 U.S. 802 (1998) (conclusory allegations of retaliation insufficient to state claim). Here, there is no evidence that these Defendants, none of whom work for the DPSCS, had the authority to effectuate Plaintiff's transfer to another prison.

D.   <u>Sufficiency of claim against Wexford</u>

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 Fed. Appx. 279, 282 (4th Cir. 2009). As with a claim against a municipality, liability against a corporation for an alleged violation of constitutional rights may be premised on an allegation that a policy or practice has caused the injury alleged. *See Monell v.*

*New York City Dept. of Social Services*, 436 U.S. 658, 691(1978); *see also Simons v. Montgomery County Police Officers*, 762 F.2d 30, 33 (4th Cir. 1985). To sustain such a claim, however, Plaintiff must establish (1) the existence of a constitutional violation, *see Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (jury's finding that a police officer inflicted no constitutional injury on the plaintiff removed any basis for municipal liability against city and members of police commission) and (2) any constitutional violations were proximately caused by a policy, custom, or practice of the Defendants, *see Monell*, 436 U.S. at 691.

Plaintiff's generalized assertions that there is a policy requiring less efficacious treatment for prisoner's in need of surgery or other medical services is unsupported by any evidence of such a policy. Plaintiff fails to explain the basis for this assertion and fails to identify the policy. Even if there is such a policy, there is no evidence that Plaintiff's treatment was formed by such a policy or that he was somehow injured by it. In any event, Plaintiff's claim fails as there does not exist in this case a constitutional violation.

## CONCLUSION

By separate Order which follows, the complaint shall be dismissed as to Defendants Rahman, Bennet, Reese, Yahya, and Mahler; summary judgment shall be granted as to all remaining claims. The remaining motions shall be denied or granted as indicated in this Memorandum Opinion.

3/3/30
Date

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE